IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br>v.<br><br>MARLON ALONZO SMITH,<br><br>                Defendant. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**<br><br>Case No. 2:16-cr-0020-DN<br><br>District Judge David Nuffer |

Defendant Marlon Alonzo Smith ("Defendant") has moved to suppress (1) evidence seized as a result of a traffic stop and search of the rental vehicle he was driving on January 1, 2016, and (2) evidence resulting from a search of Defendant's cellular telephones on or about January 5, 2016 ("Motion to Suppress").[1]  As set forth below, the search of the rental vehicle did not violate the Fourth Amendment. Therefore, the Motion to Suppress is DENIED.

Because the government has represented that it will not use any evidence obtained from the January 5, 2016 search of Defendant's cellular telephones, the portion of the Motion to Suppress dealing with cell phone evidence is MOOT and will not be addressed in this memorandum decision and order.

**CONTENTS**

CONTENTS ............................................................................................................................... 1
RELEVANT FACTS ................................................................................................................ 2
    Defendant Stopped for Speeding ....................................................................................... 2
    Roadside Interaction .......................................................................................................... 3
    Trooper Withers Screens Defendant's Vehicle with Narcotics Detector Dog .................. 5
    Trooper Wood Arrives and Defendant Flees ..................................................................... 6
    Dispatch Responds, Indicating Warrant Out for Defendant Related to Drugs .................. 8

---

[1] Motion to Suppress Evidence ("Motion to Suppress"), docket no. 25, filed May 13, 2016.

DISCUSSION ............................................................................................................................. 9
        The Dog Sniff of Defendant's Vehicle Did Not Prolong the Stop ................................. 13
        Trooper Withers Had Reasonable Suspicion ................................................................. 14
        Motion to Suppress Information from Defendant's Cellular Phones ............................. 17
ORDER .................................................................................................................................... 17

## RELEVANT FACTS

Utah Highway Patrol Trooper Jared Withers is both experienced and trained in traffic stops and generally as a Utah Highway Patrolman.[2] He is also a certified narcotics dog handler whose dog, Marco, was likewise certified during the events set forth below.[3]

### Defendant Stopped for Speeding

The events in question pertain to January 1, 2016, which was a cold day, with clear skies and snow on the ground.[4] Utah Highway Patrol Trooper Jared Withers was parked in his patrol vehicle at milepost 91 on Interstate 70 in Southern Utah.[5] He was facing west, monitoring eastbound traffic.[6] At 10:11 a.m., a black car approached, driven by the Defendant, at a high rate of speed.[7] Trooper Withers visually estimated the car to be travelling at 90 miles per hour.[8] A radar reading indicated the car was traveling 89 miles per hour.[9] The speed limit in the area is 80

---

[2] Transcript of Motion to Suppress Hearing ("Tr.") at 47:7-8 (June 22, 2016).

[3] Tr. 47:8-10.

[4] Tr. 47:13–15.

[5] Tr. 47:15-16.

[6] Tr. 47:15-16.

[7] Tr. 47:16-17.

[8] Tr. 47: 19-20.

[9] Tr. 47:19-21.

miles per hour.[10] Trooper Withers initiated a traffic stop, and Defendant ultimately stopped his vehicle at about Milepost 92.[11]

**Roadside Interaction**

After Defendant pulled over and stopped, Trooper Withers approached Defendant's car on the passenger side, where the window was rolled down.[12] He asked the Defendant, "why are you going so fast?"[13] Defendant responded that he was going 75 miles per hour.[14] Trooper Withers replied, "No, you were going 89."[15] Defendant explained that he had just stopped at a rest stop and had been shaving.[16]

Trooper Withers asked for registration and a driver's license.[17] Defendant first tendered a rental contract that was not in his name.[18] Defendant then provided a second contract that was in his name.[19] This contract was for a one day rental beginning December 30 and ending December 31, 2015 – the day before the stop.[20] Trooper Withers then commented that the rental contract was overdue, and Defendant responded that the rental agency instructed him to call back at 3 p.m. that day (January 1) to extend the contract.[21] Defendant stated that he intended to extend the

---

[10] Tr. 47:21-22.
[11] Tr. 47:22-23.
[12] Tr. 47:23-24.
[13] Tr. 47:23-25.
[14] Tr. 48:1-2.
[15] Tr. 48:3.
[16] Tr. 48:3-5.
[17] Tr. 48:6-7.
[18] Tr. 48:7-8.
[19] Tr. 48:7-8.
[20] Tr. 48:8-10.
[21] Tr. 48:11-13.

rental another week.[22] Trooper Withers testified at the June 22, 2016, evidentiary hearing that he thought Defendant's explanation was reasonable.[23]

Trooper Withers asked again for Defendant's driver's license.[24] Defendant then provided a California driver's license bearing his name.[25] Defendant stated again that he left the rest area recently from shaving.[26] Trooper Withers testified that during the exchange he noticed that Defendant's hands were shaking to an unusual degree.[27]

Trooper Withers thereafter invited Defendant back to his vehicle to continue conversation.[28] Trooper Withers testified that he did not want to delay the stop more than necessary, but he had a couple of things he wanted to take care of.[29] Defendant questioned Trooper Withers's request for him to go back to the patrol car, and Trooper Withers again asked if Defendant would like to come back to his car.[30] Defendant said, "I'd like to stay," and Trooper Withers said, "That's fine."[31] Trooper Withers then instructed Defendant to turn off the car, and Defendant complied.[32]

Trooper Withers indicated it is uncommon for drivers to refuse the invitation to return to his car and that maybe only a handful out of thousands that he stops refuse an invitation to come

---

[22] Tr. 48:14.
[23] Tr. 48:15-16.
[24] Tr. 48:17-18.
[25] Tr. 48:17-19.
[26] Tr. 48: 20-21.
[27] Tr. 48:20-23.
[28] Tr. 17:20-23.
[29] Tr. 48:24 to 49:2.
[30] Tr. 49:2-4.
[31] Tr. 49:4-5.
[32] Tr. 49:5-6.

back.[33] He also testified that, in the handful of cases where the drivers refused to come back, a seizure or arrest was the usual result.[34]

### Trooper Withers Screens Defendant's Vehicle with Narcotics Detector Dog

Once Trooper Withers was back in his car, he called dispatch and indicated, either for the record or to dispatch, that this was a one-day rental, that the driver's hands were shaking "like crazy," it was a California registered car, and that the driver did not want to come back to his car.[35] Trooper Withers also scanned Defendant's driver's license and relayed the information to dispatch.[36] Trooper Withers had not yet finished completing the citation in the car and could have stayed in his car while waiting to hear back from dispatch, but instead, at 10:16, he exited his car and deployed Marco, his narcotics-trained dog, on Defendant's car.[37] Trooper Withers testified that he decided to use Marco for a canine search of Defendant's car because Defendant's hands were shaking and because he was driving an expired rental car.[38] Trooper Withers testified that he would have run the canine search regardless of whether Defendant had agreed to come back to the dispatch car.[39]

Trooper Withers brought Marco to the front of the car and proceeded counterclockwise around the car.[40] While circling the car, Marco alerted on the open passenger window, jumping up to it three times, and kept changing direction and sniffing intensely with his tail wagging.[41]

---

[33] Tr. 49:7-10.

[34] Tr. 49:10-11.

[35] Tr. 49:12-17.

[36] Tr. 49:18-20.

[37] Tr. 49:20-23.

[38] Tr. 38:8-10.

[39] Tr. 38:4-7.

[40] Tr. 49:23-24.

[41] Tr. 49:25 to 50:3.

According to Trooper Withers, Marco was having a hard time pinpointing the smell, but as later reported to dispatch, was "working like crazy."[42] Marco made final responses on the trunk seam and license plate.[43] He also returned a couple times to the trunk for what was referred to as a confirmation sniff.[44] Trooper Withers then repeated, for the record or for dispatch, that Marco "alerted like crazy" and went back to the license plate after being pulled off.[45]

While Marco was sniffing, Trooper Withers noticed some movement in the car and saw Defendant's hand move toward a position where it might have started the vehicle.[46] But when Trooper Withers made eye contact with Defendant, Defendant lowered his hand away from the ignition.[47]

The deployment of Marco occurred five minutes after the stop began, and Trooper Withers indicated that if a driver would come back to his vehicle, there was usually a conversation that would result in a delay, but the deployment would still occur maybe six or seven minutes later, rather than the five minutes it took in this case.[48]

### Trooper Wood Arrives and Defendant Flees

By the time the canine sniff finished and Trooper Withers was back in his vehicle, there was still no report from dispatch.[49] Another Utah Highway Patrolman, Trooper Bronson Wood,

---

[42] Tr. 50:12-15.

[43] Tr. 50:4-5.

[44] Tr. 50:5-6.

[45] Tr. 50:15-19.

[46] Tr. 50:7-11.

[47] Tr. 50:7-11.

[48] Tr. 50:20-24.

[49] Tr. 50:25 to 51:1.

6

pulled in at that time and there was a brief statement to Trooper Wood of what Trooper Withers had seen and that Marco had alerted on Defendant's vehicle.[50]

At 10:18, Trooper Withers approached Defendant's vehicle again and asked where he was headed.[51] Defendant said he had family in Ohio and Trooper Withers asked, "Do you know of any reason why my dog would alert to your vehicle?"[52] Defendant indicated that he had a vaporizer and handed it to Trooper Withers from the center console.[53] Trooper Withers commented that it was not one he had seen before and asked where the vapor went in.[54] Defendant then handed Trooper Withers a vial from material in the passenger seat, and when Trooper Withers asked if it was THC oil, Defendant said, "Yes."[55]

Because Marco was not trained to alert on THC oil, Trooper Withers set the vaporizer and THC oil on the roof and asked Defendant, "Are you responsible for anything else in the vehicle?"[56] Defendant said, "No."[57] Trooper Withers then asked, "Do you have luggage in the trunk?" According to Trooper Withers' testimony, Defendant responded by swallowing hard and saying yes.[58]

Trooper Withers then asked Defendant to exit the vehicle.[59] Defendant asked why, and Trooper Withers responded ordering Defendant to exit the vehicle, explaining that his dog had

---

[50] Tr. 51:1-4.

[51] Tr. 51:5-6.

[52] Tr. 51:6-8.

[53] Tr. 51:8-9.

[54] Tr. 51:9-11.

[55] Tr. 51:11-13.

[56] Tr. 51:14-17.

[57] Tr. 51:17.

[58] Tr. 51:17-19.

[59] Tr. 51:20.

alerted to the smell of narcotics on the car.[60] Defendant then put his hand on the key and Trooper Withers yelled, "Hey!"[61] At the time, Trooper Withers was at the passenger-side window, and Trooper Wood came to the driver's-side window and reached in to prevent the start of the vehicle.[62] Defendant, however, started the vehicle.[63] While Trooper Withers removed himself from the vehicle at that point and returned to his car, Trooper Wood fought to keep Defendant from putting the car in gear and fought over the emergency brake.[64] Trooper Wood was halfway inside the vehicle when this occurred, and once the emergency brake was released, Trooper Wood was able to pull himself out of the vehicle before Defendant fled the scene in his car.[65] Defendant fled at 10:20 a.m., and both troopers pursued.[66]

Dispatch still had not responded at this point.[67]

### Dispatch Responds, Indicating Warrant Out for Defendant Related to Drugs

Moments after the pursuit was initiated, dispatch informed Trooper Withers that Defendant had a nationwide extradition warrant out of California related to drugs.[68] Trooper Withers testified that, based on the warrant, he would have arrested Defendant,[69] and the vehicle would have been impounded and held, implying that the vehicle would also have been inventoried.[70]

---

[60] Tr. 51:20-22.
[61] Tr. 51:22-24.
[62] Tr. 51:24 to 52:1.
[63] Tr. 52:2.
[64] Tr. 52:2-5.
[65] Tr. 52:5-8.
[66] Tr. 52:8-9.
[67] Tr. 52:10.
[68] Tr. 52:10-13.
[69] Tr. 52:14-15.
[70] Tr. 53:11-13.

**DISCUSSION**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[71] The U.S. Supreme Court has recognized that the "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision."[72]

"A relatively brief encounter, a routine traffic stop is more analogous to a so-called '*Terry* stop' than to a formal arrest."[73] "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns[.]"[74]

"Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to the traffic stop.'"[75] "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."[76] Continued detention for a canine sniff *can* exceed the scope of the initial traffic stop,[77] but an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop"[78] as long as the officer does not "do so

---

[71] U.S. Const. amend. IV.

[72] *Whren v. United States*, 517 U.S. 806, 809 (1996) (citations omitted).

[73] *Rodriguez v. United States*, 135 S.Ct. 1609, 1614 (2015) (internal quotation marks and alterations omitted).

[74] *Id.* at 1614 (citations omitted).

[75] *Id.* at 1615.

[76] *Id.*

[77] *Id.* at 1616-17.

[78] *Id.* at 1615 (citing *Arizona v. Johnson*, 555 U.S. 323, 327-28 (2009) (questioning) and *Illinois v. Caballes*, 543 U.S. 405, 406, 408 (2005) (dog sniff)).

in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."[79]

Two U.S. Supreme Court cases provide helpful guidance regarding the permissibility of deploying a dog during a traffic stop. The first case is *Illinois v. Caballes*,[80] and the second case is *Rodriguez v. United States*.[81]

The facts in *Caballes* are strikingly similar to the facts in this case. In *Caballes*, Illinois Trooper Daniel Gillette stopped a defendant for speeding. While Gillette was in the process of writing a ticket, a second officer ran a narcotics dog around the defendant's car. The dog alerted on the trunk. Based on that alert, the officers "searched the trunk, found marijuana, and arrested [the defendant]." "The entire incident lasted less than 10 minutes."[82]

The U.S. Supreme Court held that the dog sniff in *Caballes* did not violate the Fourth Amendment because (1) "the initial seizure of [the defendant] when he was stopped on the highway was based on probable cause and was concededly lawful;"[83] and (2) the dog sniff was legal because "the use of a well-trained narcotics-detection dog . . . during a lawful traffic stop, generally does not implicate legitimate privacy interests."[84] The rationale for that conclusion was that "any interest in possessing contraband cannot be deemed 'legitimate,' and thus, governmental conduct that *only* reveals the possession of contraband 'compromises no legitimate privacy interest.'"[85] Because a canine sniff by a trained narcotics-detection dog "discloses only

---

[79] *Rodriguez*, 135 S.Ct. at 1615.

[80] *Illinois v. Caballes*, 543 U.S. 405 (2005).

[81] *Rodriguez v. United States*, 135 S.Ct. 1609 (2015).

[82] *Caballes*, 543 U.S. at 406.

[83] *Id.* at 407.

[84] *Id.* at 409.

[85] *Id.* at 408.

10

the presence or absence of narcotics, a contraband item[,]"[86] the sniff *during* the traffic stop—not after—was permissible.

*Rodriguez* presented a similar, but critically different set of facts regarding the timing of a dog sniff. In *Rodriguez*, Rodriguez was pulled over for veering out of his lane and onto the shoulder on a highway in Nebraska. The officer approached Rodriguez's vehicle; gathered Rodriguez's license, registration, and insurance; and returned to his patrol car to run a records check. After he ran the records check on Rodriguez, the officer returned to the car, asked for the passenger's driver's license, and returned to his patrol car where he ran a records check on the passenger. At that point, the officer called a second officer to the scene and began writing a warning ticket to Rodriguez for driving on the shoulder.[87]

After running the records check on the passenger, the first officer returned to Rodriguez's vehicle a third time to present Rodriguez with the traffic ticket. He explained the warning to Rodriguez and gave back all the documentation Rodriguez and the passenger had given to him. Then, "[a]lthough justification for the traffic stop was 'out of the way,' [the officer] asked for permission to walk his dog around Rodriguez's vehicle."[88] Rodriguez said no. The officer then commanded Rodriguez to turn off the ignition, exit the vehicle, and stand in front of the patrol car to wait for the second officer to arrive. Rodriguez complied. Several minutes later, the second officer arrived and the dog was run around the vehicle. The dog alerted to the presence of drugs in the vehicle. "[S]even or eight minutes had elapsed from the time [the officer] issued the

---

[86] *Id.* at 409.

[87] *Rodriguez*, 135 S.Ct. at 1613.

[88] *Id.* at 1613.

11

written warning until the dog indicated the presence of drugs."[89] A search of the vehicle revealed methamphetamine, and Rodriguez was placed under arrest.

In analyzing the set of facts in *Rodriguez*, the U.S. Supreme Court instructed that an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop[,]"[90] but "he may not do so in a way that prolongs the stop" unless there is "reasonable suspicion . . . to justify detaining [the] individual."[91] This means that reasonable suspicion is not needed to conduct "certain unrelated checks," including dog sniffs, if doing so does not prolong the stop. "The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket, . . . but whether conducting the sniff 'prolongs' –*i.e.*, adds time to—'the stop[.]'"[92]

Here, Defendant does not contest the lawfulness of his initial traffic stop. Rather, he disputes whether Trooper Withers had reasonable suspicion to conduct the canine sniff.[93] However, because the canine sniff did not prolong the stop, there is no need to address reasonable suspicion. An officer is allowed to "conduct certain unrelated checks during an otherwise lawful traffic stop"[94] without reasonable suspicion as long as the officer does not "do so in a way that prolongs the stop . . . ."[95] This is because "any interest in possessing contraband

---

[89] *Id.*

[90] *Id.* at 1615.

[91] *Id.*

[92] *Id.* at 1616.

[93] [Defendant's Proposed] Order Granting Defendant's Motion to Suppress at 9, docket no. 36, filed Aug. 15, 2016 ("Trooper Withers Did Not Have Reasonable Articulable Suspicion to Conduct a Canine Sniff of Smith's Vehicle.").

[94] *Rodriguez*, 135 S.Ct. at 1615 (citing *Johnson*, 555 U.S. at 327-28 (questioning) and *Caballes*, 543 U.S. at 406, 408 (dog sniff)).

[95] *Rodriguez*, 135 S.Ct. at 1615.

cannot be deemed 'legitimate,' and thus, governmental conduct that *only* reveals the possession of contraband 'compromises no legitimate privacy interest.'"[96]

### The Dog Sniff of Defendant's Vehicle Did Not Prolong the Stop

Here, as in *Caballes*, Trooper Withers' use of a narcotics detector dog did not extend the traffic stop. After initially stopping Defendant for speeding, Trooper Withers approached Defendant and obtained his driver's license. He then returned to his patrol vehicle to request a driver's license, warrants, and criminal history check on Defendant. Each of these requests fell squarely within the "ordinary inquiries incident to [a traffic] stop."[97]

Within five minutes of the initial stop—and *before* hearing from dispatch on the information he had requested—Trooper Withers deployed his certified narcotics detector dog to sniff the vehicle. The dog alerted on the vehicle. This is almost exactly like *Caballes*, where the dog was run *while the officer was filling out the traffic citation*. Here, Trooper Withers had not even heard back from dispatch yet, and therefore could not be considered to have completed the ordinary tasks related to the traffic stop. This is much different than *Rodriguez*, where "seven or eight minutes had elapsed *from the time [the officer] issued the written warning* until the dog indicated the presence of drugs."[98] Thus, running Marco around the vehicle was not a violation of Defendant's Fourth Amendment Rights.

The duration of a traffic stop is a significant consideration, and an officer may not unreasonably delay tasks related to the traffic stop in order to "earn bonus time to pursue an unrelated criminal investigation."[99] But there is no indication that Trooper Withers unreasonably delayed fulfillment of his responsibilities or advised dispatch to delay. The dog was brought out

---

[96] *Caballes*, 543 U.S. at 408.

[97] *Id.*

[98] *Rodriguez*, 135 S.Ct. at 1613 (emphasis added).

[99] *Id.* at 1616.

of the car almost immediately after the stop, and thus, the use of the dog did not prolong the traffic stop.

There is language in *Rodriguez* stating that because a dog sniff is aimed at generally detecting criminal wrongdoing, it is not an "ordinary incident of a traffic stop" and it is "not fairly characterized as part of the officer's traffic mission."[100] Those statements seem to contradict the statements in *Caballes* that *permit* a dog sniff as long as the dog only detects illegal contraband.[101] But these statements can be reconciled when considering the differing facts of each case. *Cabablles* involved a dog sniff that occurred before completion of the traffic stop, while *Rodriguez* involved a dog sniff that occurred after the completion of the traffic stop. Thus, the statements in *Rodriguez* can be understood to mean that a dog sniff that occurs outside the reasonable time to complete a traffic stop, or a dog sniff that prolongs the stop, is not an ordinary incident of a traffic stop and not part of the officer's traffic mission. However, when the dog sniff occurs *within* the appropriate time frame, and does not prolong the stop, it is permissible. Since Trooper Withers ran the dog within the time it would reasonably take to complete the traffic stop, and it did not prolong the stop, the dog sniff was permissible and did not violate Defendant's Fourth Amendment rights.

### Trooper Withers Had Reasonable Suspicion

Even if the dog sniff could be considered to have "prolonged" the traffic stop, Trooper Withers had reasonable suspicion to run Marco around Defendant's vehicle.

---

[100] *Id.* at 1615.

[101] *Caballes*, 543 U.S. at 409.

To determine whether an officer has reasonable articulable suspicion, the court must examine the "totality of the circumstances."[102] Courts have recognized the following factors as justifying a continued detention: "having no proof of ownership of the vehicle, having no proof of authority to operate the vehicle, and inconsistent statements about destination."[103] Other factors that the Tenth Circuit has recognized include that "drug couriers often use third-party rental cars" and that a vehicle registered to a third party who is not present may indicate drug trafficking.[104] However, the Tenth Circuit has repeatedly held that "[n]ervousness alone cannot support reasonable suspicion of criminal activity."[105] Rather, nervousness should only be considered where there is "unusually extreme or prolonged nervousness."[106] Further, the Tenth Circuit has emphasized that "refusal to consent should not [be] considered in determining reasonable suspicion."[107]

Here, the totality of the circumstances indicates a suspicious set of circumstances. First, Defendant presented an expired rental contract with someone else's name. And although Defendant ultimately presented a rental contract with his name on it, the rental contract bearing Defendant's name was expired. Even though Trooper Withers testified at the hearing that the explanation provided by Defendant was "reasonable," there was still suspicion raised by the presentation of an expired rental contract with someone else's name. Second, Defendant's hands were shaking to an unusual degree. While it is true that nervousness alone cannot support

---

[102] *United States v. Ludwig*, 641 F.3d 1243, 1248 (10th Cir. 2011) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

[103] *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998) (citations omitted).

[104] *United States v. Williams*, 271 F.3d 1262, 1269 (10th Cir. 2001) (citations omitted); *Ludwig*, 641 F.3d at 1249 (citations omitted).

[105] *Williams*, 271 F.3d at 1269 (quoting *United States v. Salzano*, 158 F.3d 1107, 1111 (10th Cir. 1998)).

[106] *Ludwig*, 641 F.3d at 1250 (citation omitted).

[107] *Hunnicutt*, 135 F.3d at 1350 (citing *Florida v. Bostick*, 501 U.S. 429, 437 (1991)) (additional citations omitted).

reasonable suspicion, this factor is not considered on its own. It is considered with the other factors identified in this paragraph. Further, while it was cold that day, and Defendant suggests this could have been the reason for his shaky hands, Defendant has not identified, and review of the video of the traffic stop did not identify, any point in his exchange where Defendant indicates that his hands were shivering because he was cold.[108] Thus, the after-the-fact explanation for the shaking is less credible than if Defendant had made an indication of being cold during the exchange.

Therefore, even if the dog sniff could be considered to have "prolonged" the traffic stop, Trooper Withers had articulable reasons to prolong the stop and investigate further. And although Defendant attempts to explain why each of these reasons cannot stand individually, he has not successfully shown how they cannot establish reasonable suspicion when considered collectively under the "totality of the circumstances."

Because the dog sniff was permissible, as explained above, any indication or alert from the dog is properly considered in Trooper Withers's "reasonably suspicion" analysis. The dog sniff resulted in a positive alert for narcotics, which is another reason for Trooper Withers to have extended the stop. As explained above, the dog sniff occurred before the traffic stop was completed—even before Trooper Withers had heard back from dispatch—so the dog sniff provided additional grounds for reasonable suspicion.

For all these reasons, the traffic stop and related activities did not violate Defendant's rights under the Fourth Amendment.

---

[108] Government Ex. 2 (footage from Trooper Withers's dashboard video camera) (on file in chambers).

**Motion to Suppress Information from Defendant's Cellular Phones**

At the evidentiary hearing on the Motion to Suppress, the government represented that it would not use at trial any information derived from the January 5, 2016, search of the cellular phones recovered from Defendant's vehicle and searched pursuant to a Utah state search warrant. Based upon that representation, the portion of the Motion to Suppress dealing with cell phone evidence is MOOT.

**ORDER**

IT IS HEREBY ORDERED that Defendant's Motion to Suppress[109] is DENIED. The portion of the Motion to Suppress dealing with cell phone evidence is MOOT.

IT IS FURTHER ORDERED that the oral argument currently scheduled for October 3 is VACATED.

Dated September 12, 2016.

BY THE COURT:

David Nuffer
United States District Judge

---

[109] Motion to Suppress Evidence ("Motion to Suppress"), docket no. 25, filed May 13, 2016.